ELIZABETH MANNION, PLAINTIFF-APPELLEE, v. HUDSON & MANHATTAN RAILROAD COMPANY, A CORPORA-TION, DEFENDANT-APPELLANT.

Submitted October 1, 1940—Decided January 24, 1941.

Before BROGAN, CHIEF JUSTICE, and Justices PARKER and PERSKIE.

For the appellant, *Collins & Corbin* (*Edward A. Markley* and *Charles W. Broadhurst,* of counsel).

For the appellee, *John A. Lombardi* (*Joseph F. S. Fitzpatrick,* of counsel).

The opinion of the court was delivered by

PERSKIE, J. This is an action in tort. Defendant appeals from a judgment, based on a jury verdict, of $600 and costs in favor of plaintiff.

Although plaintiff had, admittedly, executed a general release of all her claims against defendant, she claimed, in her amended reply, that the release was procured by fraud, imposition and deceit, on the part of defendant's agents, servants and employes.

The single question argued here and requiring decision is whether upon the facts adduced and the proper inferences deducible therefrom, the trial judge erred, as defendant claims, in denying its motion for a directed verdict.

The applicable law is settled. From the written execution of a release, flows the presumption that the party signing the same read, understood and assented thereto. This presumption is conclusive unless the signature was obtained by fraud or imposition practiced upon the party signing, with the intention of deceiving such party as to the purport of the paper signed. *McKenna* v. *Montclair Police, &c., Commission,* 121 *N. J. L.* 206, 209; 1 *Atl. Rep.* (2d) 756; *Paruch* v. *Rasiewicz,* 124 *N. J. L.* 356, 359, 360; 12 *Atl. Rep.* (2d) 141. Thus when, as here, the defendant pleads a general release as a defense, the plaintiff's attack on such release must be bottomed upon the fraud or deceit of the party who procured its execution and not upon the plaintiff's failure to comprehend the significance or effect of his act in signing it. When such fraud or deceit is shown to have been practiced by the defendant in misrepresenting the contents or the execution of a release, the plaintiff may, in an action at law, avoid its consequences. And when the fraud is in dispute it is a question for the jury. *Dunston Lithograph Co.* v. *Borgo,* 84 *N. J. L.* 623, 625; 87 *Atl. Rep.* 334; *Fagan* v. *Central Railroad Co.,* 94 *N. J. L.* 454, 457; 111 *Atl. Rep.* 32; *Palmer* v. *Tomlin,* 104 *N. J. L.* 215, 216, 217; 141 *Atl. Rep.* 2. Each case, of course, necessarily stands or falls upon the particular circumstances involved. In light, therefore, of the stated principles, a statement of the facts, in the case at bar, leading up to and including the execution of the release, and the proper inferences to be drawn therefrom, will demonstrate that the trial judge, as we think, properly denied defendant's motion for a directed verdict in its favor.

Elizabeth Mannion, the plaintiff, was a woman seventy-three

years of age. On September 13th, 1938, while entering the front door of one of defendant's subway trains at its Twenty-third street station, in New York City, the door "snapped" shut and hit the plaintiff on the right arm, crushing her against the left side of the door. On the following morning, while at the defendant's station at Journal Square, Jersey City, New Jersey, plaintiff became sick to her stomach. A policeman employed by defendant company spoke to her and she told him that she was affected by a shaking up which she had received in the subway station the previous day. Upon learning that she had not made any statement of the accident, he promptly took her name and her address and suggested that she go home. Thereafter defendant moved and acted swiftly and astutely. Immediately upon plaintiff's arrival at her home, a representative of the defendant company called upon her. He took a statement from her and told her that she should go to see Dr. Ryan (defendant's doctor) at the defendant's offices in New York City.

As requested, plaintiff went to see Dr. Ryan on that very same day. After examining her, the doctor stated that she suffered a "possible fracture of the ribs" and then proceeded to strap her body, instructing her to return to see him the following day. He then led her across the hall to the office of Mr. Kay, the secretary of the defendant company, who supervised the handling of claims against the company for personal injuries.

Plaintiff testified that Kay told her that the defendant would do everything that could possibly be done for her and warned her not to "go near the Medical Center, nor don't go near any lawyer." She stated that although she had neither asked for, nor thought of, any money, Kay volunteered that he would give her $50 "to tide [her] over."

Plaintiff also testified that when she asked Kay, "Well, what proof have I got that you are going to take care of me?" he answered, "Oh, mother, I'm ashamed of you. I would do as much for you as I would for my own mother. Now to show you that I mean it, I will put my name down here." Kay, she stated, then signed a paper. It is interesting, at this point, to observe that below the formal execution of the release

in issue the following words were added by Kay in long hand: "Company further agrees to furnish such medical attention as is necessary by reason of injury sustained Sept. 13th, 1938." This was rather an ingenious way, to say the least, of being helpful.

After plaintiff had the $50 in her hand, Mr. Lindenstruth, the chief clerk in the secretary's office and claim department of the defendant company, entered the office. Plaintiff testified that since she did not have her glasses and could not see well enough to read (this circumstance is free from dispute), Lindenstruth read to her the contents of a yellow paper but that the paper she signed was a white paper—the release—the contents of which she did not know at that time. *Cf. Palmer* v. *Tomlin, supra.* She stated that no mention of the word "release" was made by Kay nor Lindenstruth although it is mentioned four times in the release which she signed.

Plaintiff then testified that after medical aid from defendant's doctors ceased, and it did, she was forced to seek medical attention from the Jersey City Medical Center and from doctors in private practice. Dr. Fallon, who treated her as a patient in the hospital and as a private patient, testified that her condition "was very little improved."

Kay denied that he addressed plaintiff as "mother." Both he and Lindenstruth testified that no imposition nor fraud was practiced upon plaintiff; that they did not attempt to deceive her; that before she signed the release it was read to her; and that she fully understood what she had signed. True, their testimony was positive while some of plaintiff's testimony was confused, but the jurors saw the witnesses, observed their demeanor, heard their testimony, and considered not only the respective interests of the parties but also their actions. It was, therefore, the exclusive function of the jury to determine, on the conflicting proofs, where the truth lay.

The trial judge properly submitted the case to the jury.

Judgment is affirmed, with costs.